AO 108 (Rev. 06/09) Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br>WELLS FARGO ACCOUNT NUMBER 9804825850<br>UNDER THE NAME JOSEPH J COSENTINO | )<br>)<br>)  Case No.   MR 25-892<br>)<br>) |

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of ___New Mexico___ is subject to forfeiture to the United States of America under ___21___ U.S.C. § ___881(a)(6)___ *(describe the property)*:

Approximately $17,800.54 in U.S. currency in the Wells Fargo checking account with account number 9804825850 under the name "Joseph J Cosentino".

The application is based on these facts:

Please see the attached application of FBI Special Agent Alexandra Rodriguez which is incorporated by reference and has been reviewed by AUSA Lou Mattei.

☑ Continued on the attached sheet.

_____
*Applicant's signature*

Alexandra Rodriguez, FBI Special Agent
*Printed name and title*

Telephonically sworn and electronically signed.

Date: May 15, 2025

_____
*Judge's signature*

City and state:  Albuquerque, New Mexico          Hon. John F. Robbenhaar, U.S. Magistate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEIZURE OF:<br><br>WELLS FARGO ACCOUNT NUMBER 9804825850 UNDER THE NAME JOSEPH J COSENTINO | Case No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A WARRANT TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Alexandra Rodriguez, Special Agent (SA) of the Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2022. As such, I am an investigative law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am currently assigned to the Transnational Organized Crime Task Force and investigate Drug Trafficking Organizations ("DTOs") involved in the unlawful possession of firearms, distribution of controlled substances, crimes, and conspiracies associated with these offenses. Through my training and experience, I am familiar with the methods and means used by individuals, DTOs, and gang/criminal enterprises to transport, store, and move controlled substances, firearms, and humans.

2. I have participated in drug-related investigations utilizing various means available to law enforcement to include video surveillance, photography, pen registers, vehicle trackers, search warrants, and other physical and technological investigative techniques. In addition, I have received advanced training and instruction from state, local, and federal agencies related to narcotics trafficking, organized crime investigations, money laundering, firearms trafficking,

1

surveillance (both physical and technical), undercover operations, managing federal and local undercover employees, recruiting and managing Confidential Human Sources ("CHS"), analyzing financial records and phone records, executing arrest and search warrants, and issuing subpoenas. I am familiar with how these individuals conceal the profits of their illegal activities. I have also taken a 40-hour course on Mexican cartels and "Narco" culture.

## IDENTIFICATION OF PROPERTY TO BE SEIZED

3. I make this affidavit in support of an application for the issuance of a warrant to seize the following property subject to forfeiture:

   a. Approximately $17,800.54[1] in U.S. currency in the Wells Fargo checking account with account number 9804825850 under the name "Joseph J Cosentino" (hereinafter the "SUBJECT ACCOUNT").

4. Based upon the facts detailed in this affidavit, I believe there is probable cause that the SUBJECT ACCOUNT contains (1) moneys furnished in exchange for a controlled substance, (2) moneys intended to be furnished in exchange for a controlled substance, (3) proceeds traceable to such an exchange, or (4) moneys used or intended to be used to facilitate the manufacture, distribution, or possession with intent to distribute a controlled substance, in violation of 18 U.S.C. § 841. Accordingly, the SUBJECT ACCOUNT is subject to criminal judicial forfeiture under 21 U.S.C. § 853(a) and to civil judicial forfeiture under 21 U.S.C. § 881(a). I am seeking a warrant authorizing the criminal seizure of the SUBJECT ACCOUNT pursuant to 21 U.S.C. §§ 853(e) and (f), and civil seizure of the SUBJECT ACCOUNT pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 881(b).

---

[1] This balance was current as of February 18, 2025, which is the most recent information available to law enforcement.

2

## RELEVANT STATUTES

I.   **Criminal and Criminal Forfeiture Statutes**

9.   Title 21 United States Code § 841(a) provides that "[e]xcept as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance; (2) to create, distribute, or dispense, or possess with intent to distribute or dispense, a counterfeit substance." 21 U.S.C. § 841(a). Subsection (b) designates the penalties corresponding to various controlled substances in various amounts. These controlled substances include methamphetamine. 21 U.S.C. § 841(b).

10.   Title 21 United States Code § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 21 U.S.C. § 846.

11.   Title 21 United States Code § 853(a) provides, in relevant part, the following: "Any person convicted of a violation of this subchapter or subchapter II punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law— (1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation" and "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation[.]"

12.   Title 21 United States Code § 853(f) provides that "[t]he Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to

3

forfeiture and that an order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property."[2] 21 U.S.C. § 853(f).

13. Title 18 United States Code § 982(b)(1) provides that "[t]he forfeiture of property under this section, including any seizure and disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 853)."

## II.   Civil Forfeiture Statutes

14. Title 21 United States Code § 881(a)(6) provides that "[t]he following shall be subject to forfeiture to the United States and no property right shall exist in them: . . . (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter." 21 U.S.C. § 881(a)(6).

15. Title 21 United States Code § 881(b) provides that "[a]ny property subject to forfeiture to the United States under this section may be seized by the Attorney General in the manner set forth in section 981(b) of Title 18." 21 U.S.C. § 881(b).

---

[2] 21 U.S.C. § 853(e) provides for protective orders to restrain certain property or enjoin its use/alienation. This provision also provides for the execution of a performance bond or other action to preserve the availability of property for forfeiture. As described in more detail below, however, there is reason to believe that these measures would be insufficient to preserve the availability of the property for forfeiture in the present situation.

4

16. Title 18 United States Code § 981(b)—which is referred to by 21 U.S.C. § 881(b) (above)—governs civil seizure and forfeiture of property by the Attorney General and other designated individuals.

17. Title 18 United States Code § 981(b)(2) provides, in relevant part, that "[s]eizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure." 18 U.S.C. § 981(b)(2).

18. Title 21 United States Code § 881(e) provides for the disposition of property civilly or criminally forfeited pursuant to federal narcotics statutes.

## PROBABLE CAUSE

I. **Overview of Investigation**

19. In August 2023, the FBI and Isleta Police Department ("IPD") initiated undercover ("UC") and confidential source ("CS") operations to identify and disrupt drug distribution on the Isleta Pueblo and in Albuquerque, New Mexico. During the investigation, the FBI identified a DTO led by Joseph COSENTINO (the COSENTINO DTO).

20. Based on court records, COSENTINO's criminal history appears to include prior convictions for Residential Burglary (2018), Receiving or Transferring Stolen Motor Vehicles (2018), Aggravated Fleeing a Law Enforcement Officer (2019), and Receiving Stolen Property (2024). At the time of some of the events described below, COSENTINO was on probation with the state of New Mexico for a 2024 conviction related to Receiving Stolen Property.[3]

21. Between December 2023 and November 2024, the FBI conducted multiple

---

[3] Based on court records, COSENTINO was sentenced to a fully suspended sentence beginning 4/30/2024, for a total of 18 months, which was set to terminate on 10/30/2026. He received an unsatisfactory discharge terminating probation on 03/06/2025.

5

controlled buys of methamphetamine involving members of the COSENTINO DTO. COSENTINO facilitated these methamphetamine sales in a similar manner each time: COSENTINO would receive a call requesting methamphetamine, depart his residence, briefly stop at a stash house to retrieve the requested amount of methamphetamine, then meet with lower-ranking members of his DTO to exchange narcotics for cash.

**II.     Controlled Purchases of Methamphetamine Involving COSENTINO**

   **A.     September 17, 2024**

19.     On September 17, 2024, CS-1[4] purchased a half pound of methamphetamine from COSENTINO by way of DTO member Bryant WATTIER. WATTIER is a distributor for the DTO.

20.     To initiate the transaction, CS-1 placed a Facebook Messenger call to WATTIER, but WATTIER did not answer. CS-1 waited a few minutes to see if WATTIER would call back. WATTIER did not. CS-1 proceeded to WATTIER's residence. CS-1 exited the vehicle and approached the front door and spoke to WATTIER's wife/girlfriend and advised WATTIER would be back in 30 minutes. Approximately 30 minutes later, WATTIER arrived at his residence. WATTIER told CS-1 he would place a call for an estimated time of arrival for CS-1's methamphetamine order.

---

[4] CS-1 is a paid informant for the FBI and has been since October 2023. Since October 2023, CS-1 has been paid approximately $4,000 by the FBI for his/her work on various investigations. CS-1 has been truthful and forthcoming, and his/her information has been independently corroborated at multiple levels. CS-1 has first-hand familiarity with Bryant WATTIER, who is supplied by COSENTINO, because CS-1 has been supplied with drugs by WATTIER since at least 2023. CS-1's information has led to approximately 3 successful search warrants and provided investigative information to assist state investigations. CS-1's criminal history includes arrests and/or convictions for Possession of a Controlled Substance, Aggravated Assault Receiving/Transferring a Motor Vehicle, and Forgery.

21. Approximately 10 minutes later, agents observed COSENTINO depart his residence (hereinafter, PREMISES 2)[5] in a Lexus RC 350. After picking up another, unidentified male and making other stops that are not relevant here, COSENTINO drove to a stash house (hereinafter, PREMISES 1). COSENTINO parked on the curb in front of PREMISES 1 and exited the vehicle. He walked to the left side of the main residential structure on PREMISES 1, where there is a metal gate leading into the backyard of PREMISES 1, and disappeared from view.

22. Approximately two minutes later, COSENTINO emerged from the same left-side area of PREMISES 1 and entered the Lexus RC 350. COSENTINO then departed PREMISES 1 and drove to an Auto Zone store located at 1428 Eubank Blvd. NE in Albuquerque. COSENTINO parked next to a truck, reached his hand out of the driver's side window, and handed something to the driver of the truck. COSENTINO then departed Auto Zone. Based on my training and experience, I know that drug traffickers often deliver their product to customers in quick hand-to-hand transactions to avoid detection by law enforcement or bystanders. I believe COSENTINO participated in such a drug transaction during the exchange described above.

23. COSENTINO then drove back to PREMISES 1 where he again parked on the street in front of the residence. COSENTINO exited his vehicle and again walked to the left side of PREMISES 1 before disappearing from view. Approximately one minute later, COSENTINO emerged from the left side of PREMISES 1, entered his vehicle, and departed PREMISES 1. COSENTINO then drove directly to WATTIER's residence and parked outside. WATTIER approached the driver's side window of the Lexus RC 350 and reached inside the vehicle. As WATTIER walked away from the Lexus, it appeared he had an item concealed under his shirt.

---

[5] During an interview on December 3, 2024, the property manager for the apartment complex at 2604 Chelwood Park Blvd. confirmed COSENTINO signed a one-year lease for Unit A in August 2024.

Based on my training and experience, and the other facts outlined herein, I believe this is consistent with COSENTINO providing WATTIER with the methamphetamine that WATTIER had agreed to sell to CS-1.

24. COSENTINO then departed WATTIER's residence and dropped off the unidentified passenger before returning to his own residence (PREMISES 2). COSENTINO exited the vehicle and entered PREMISES 2.

25. Approximately three minutes passed between when WATTIER took possession of the methamphetamine from COSENTINO and when WATTIER gave the half-pound of methamphetamine to CS-1. CS-1 paid WATTIER approximately $850 for the methamphetamine. According to lab testing, the methamphetamine from COSENTINO and WATTIER was approximately 218.9 net grams of pure methamphetamine.

26. Based on my training and experience, the observations described above are consistent with COSENTINO using PREMISES 1 a stash location for the drugs sold during both the hand-to-hand transaction at Auto Zone, as well as the subsequent transaction involving WATTIER and CS-1. These observations are also consistent with reporting by another confidential source (CS-2)[6] that COSENTINO typically only transports what a particular customer has ordered, meaning he would need to stop at the stash location between each transaction to procure the next customer's drugs.

---

[6] CS-2 has been an informant for the FBI since November 2024. CS-2 is working for consideration on criminal charges. CS-2's information has been corroborated and supported by investigators through independent investigations, physical surveillance, and other law enforcement activities. CS-2 has been truthful and forthcoming, and his/her information has been independently corroborated at multiple levels. CS-2 has first-hand familiarity with COSENTINO because CS-2 was supplied with drugs by COSENTINO for the past couple years. CS-2's criminal history includes arrests and/or convictions for Selling Amphetamine.

**B.     November 6, 2024**

27.    On November 6, 2024, CS-1 arranged another controlled purchase from WATTIER, again sourced by COSENTINO, but this time involving one pound of methamphetamine.

28.    WATTIER asked CS-1 to come to WATTIER's residence to complete the transaction. A few minutes after CS-1 arrived at WATTIER's residence, WATTIER called COSENTINO. Specifically, based on toll analysis, WATTIER placed an outgoing call to COSENTINO, and one minute after the outgoing call, COSENTINO called WATTIER back.

29.    Approximately 10 minutes after WATTIER called COSENTINO, COSENTINO departed his residence in a silver 2021 Audi and drove to PREMISES 1, where he parked at the curb in front of the residence. As before, COSENTINO exited the Audi, went to the left side of PREMISES 1, and disappeared from view. Approximately a minute later, COSENTINO emerged from the side of the house and entered the Audi. He departed PREMISES 1 and drove to WATTIER's residence. WATTIER approached the driver's side of the Audi. About a minute later, COSENTINO departed WATTIER's residence and went back to his own residence.

30.    Approximately two minutes passed between the time WATTIER took possession of the methamphetamine from COSENTINO to the time WATTIER gave methamphetamine to CS-1. CS-1 purchased approximately one pound of methamphetamine for $1,500. The methamphetamine is pending testing by the DEA Lab.

31.    As with the September 2024 transaction, based on my training and experience, the observations described above are consistent with COSENTINO using PREMISES 1 a stash location for the drugs sold to CS-1 through WATTIER.

### III. Other Surveillance of COSENTINO

32. On October 15, 2024, agents conducted additional physical surveillance on COSENTINO. Agents observed COSENTINO at his residence, where an unidentified female entered the passenger side of a Lexus RC 350 that was registered to COSENTINO. COSENTINO opened the trunk of the vehicle and dropped a large black duffle bag, several feet in length, into the trunk. The duffle bag appeared to be full, as COSENTINO appeared to be struggling to lift it. He then closed the trunk, entered the driver's side of the Lexus RC 350, and drove away.

33. COSENTINO drove to PREMISES 1 and parked in front of the residence. COSENTINO exited the vehicle and opened the trunk. He pulled out the large black duffle bag from the trunk. COSENTINO pulled the duffle bag to the side gate of PREMISES 1 and disappeared from view. Approximately two minutes later, COSENTINO emerged from the side of house and placed the duffle bag back into the trunk. The black duffle bag appeared to be empty by the way COSENTINO easily carried it. COSENTINO entered the driver's side of the Lexus RC 350 and departed PREMISES 1. Based on my training and experience, and the other facts described herein, I believe these observations are consistent with COSENTINO dropping off bulk drugs in the black duffle bag to his stash house (PREMISES 1).

34. COSENTINO then drove into downtown Albuquerque and dropped off the unidentified female. COSENTINO then proceeded back to PREMISES 1 and parked in front of the residence.[7] A few minutes later, COSENTINO departed PREMISES 1 and arrived at a Walgreens located at 1900 Wyoming Blvd. NE. An unidentified male entered the passenger side of the Lexus RC 350. Approximately 15 minutes later, the unidentified male exited the passenger side of the vehicle and COSENTINO departed, driving back to his residence. Based on the timing

---

[7] At this time, it was dark so agents could not see what COSENTINO did at PREMISES 1.

of this meeting and the other facts described in this affidavit, I believe this meeting between COSENTINO and the unidentified male inside COSENTINO's car was consistent with a drug transaction.

35. Later that evening, COSENTINO got back into the Lexus RC 350 and departed his residence. COSENTINO arrived at PREMISES 1 and departed. COSENTINO drove down the block to Mary Ellen Street and met with the same unidentified male he previously met with at Walgreens earlier that night. COSENTINO then returned back to his residence. Again, based on the timing of this meeting and the other facts described in this affidavit, I believe this meeting between COSENTINO and the unidentified male inside COSENTINO's car was consistent with a drug transaction.

## IV. Search Warrants at COSENTINO's Residence and Stash House

36. On February 5, 2025, agents executed federal search warrants at PREMISES 2 (COSENTINO's residence located 2604 Chelwood Park Blvd, Unit A, Albuquerque, NM 87112) and PREMISES 1 (the suspected stash house).

37. Inside the garage of PREMISES 2, agents observed a large duffle bag (different in appearance from the one previously observed) that, upon closer inspection, contained what appeared to be several pounds of a white crystal substance, consistent in appearance with methamphetamine, packaged in clear Ziploc bags.

38. The duffle bag was located on the floor of the garage, immediately next to a vehicle that agents had observed COSENTINO driving earlier that day, prior to the execution of the search warrant. The keys to this vehicle were located in the living room of COSENTINO's apartment.

39. The suspected methamphetamine from COSENTINO's duffle bag was subsequently processed by FBI evidence technicians. The methamphetamine field-tested positive. It weighed approximately 3.2 gross kilograms.

40. Based on my training and experience, I believe this quantity of methamphetamine is consistent with distribution, not personal use. I also believe the manner in which the methamphetamine was packaged—in several separate Ziploc bags, within a larger duffle bag—is consistent with distribution, not personal use.

41. Agents also located two scales in the bottom of the duffle bag, under the bags of white crystal substance. The scales appeared to have a white residue on them that, based on my training and experience, is consistent with them being used to weigh drugs for distribution.

42. After locating the methamphetamine in COSENTINO's garage, agents detained COSENTINO and advised him of his *Miranda* rights. COSENTINO declined to speak with agents. He was subsequently arrested and booked on a probation violation in a case being prosecuted by the State of New Mexico.

43. During the search of PREMISES 1, agents also located a bulk quantity of methamphetamine. Specifically, in a locked storage container outside the residence, agents located approximately 30.5 gross kilograms of a substance that field-tested positive for methamphetamine. Based on my training and experience, this quantity of methamphetamine is consistent with distribution, not personal use. Its approximate street value in the Albuquerque area would be between $100,000 and $120,000.

## V.   Vehicle Purchases

44. The New Mexico Department of Workforce Solutions provides data on wages periodically reported to the department. According to the data from New Mexico Workforce

Solutions, there is no record of employment for COSENTINO since at least January 2024. Through extensive surveillance, search warrants, and other investigative techniques, agents have uncovered no evidence indicating that COSENTINO has held legitimate employment during this period of investigation.

45. Despite the lack of evidence of legitimate employment, COSENTINO has been observed driving luxury vehicles that were paid in full (via cash or cashier's check by COSENTINO or close/trusted associates) and registered to him. The vehicles included: a 2021 Audi, purchased for $63,829.29; a 2024 Lexus RC 350 purchased for $62,291.78; and a 2024 Lexus IS 500, purchased for $68,359.32—with a total combined value of $194,480.39. The discrepancy between COSENTINO's lack of reported legitimate employment and his possession of luxury assets, along with COSENTINO's observed behavior during the controlled buys, surveillance operations, and search warrants described above, is consistent with COSENTINO obtaining income from illicit activity, specifically drug trafficking.

46. Two days after COSENTINO was released from the Metropolitan Detention Center (MDC), on March 16, 2024 for a state probation violation, COSENTINO and Thomas ADAMS[8] went to Lexus of Albuquerque, located at 4821 Pan American Freeway, Albuquerque, New Mexico 87109. Four Lexus employees provided physical descriptions of ADAMS and COSENTINO. Agents introduced two images, one of COSENTINO and one of ADAMS. All four Lexus employees positively identified the men in the photographs as the men who visited the dealership.

---

[8] Based on other facts not included here, agents believe Thomas ADAMS is a former stash house owner for COSENTINO's DTO.

47. Through the use of administrative subpoena process, agents learned that ADAMS purchased a 2024 Lexus RC350 under his name, paying cash in full. ADAMS does not have a legitimate source of income, according to New Mexico Workforce Solutions records. COSENTINO has been observed on multiple occasions driving the Lexus RC350. COSENTINO later re-registered the Lexus under his name by transfer of title from ADAMS to COSENTINO, in which ADAMS stated he sold the vehicle to COSENTINO for $20,000. Agents were able to match vehicle identifiers of the Lexus RC350, confirming this is the same vehicle initially purchased by ADAMS. Since April 2024, FBI has conducted multiple controlled buys in which COSENTINO arrived to deliver half pounds of methamphetamine in the Lexus RC350.

48. On August 13, 2024, COSENTINO purchased a 2021 Audi RS 5 for $63,829.29. Investigators obtained the vehicle transaction paperwork and discovered the vehicle had no lien and it was purchased via a check from Nusenda Credit Union. Significantly, the name Adam A. Garcia was written on the check that was made payable to the car dealership. Investigators analyzed COSENTINO's toll records from August 13, 2024, and found that COSENTINO and a subject identified as Adam GARCIA were in contact approximately fourteen different times on that day.

49. Based on my training and experience, I know that drug traffickers often attempt to mask the nature, source, and ownership of proceeds from their illicit activities. Among other things, drug traffickers sometimes involve third parties as straw purchasers in financial transactions designed to conceal the nature, source, and ownership of drug proceeds. Here, the paperwork for the Audi is written in COSENTINO's name, but the check payable to the dealership referenced Adam GARCIA's name, which is consistent with masking proceeds. Agents suspect that a third party, here GARCIA, provided COSENTINO the funds to purchase the Audi that was

14

bought and registered under COSENTINO's name. Notably, Agents are unaware of any legitimate sources of income for COSENTINO and GARCIA that would generate $63,829.29 to pay in full for the vehicle.

50. Through the administrative subpoena process and witness interviews, agents learned COSENTINO purchased a black 2024 Lexus IS500 on November 15, 2024, at Lexus of Albuquerque, located at 4821 Pan American Freeway NE. COSENTINO traded in a 2024 Lexus RC350 and the 2021 Audi RS 5 for the 2024 Lexus IS500. Lexus additionally owed COSENTINO money from the two vehicles traded in. The amount Lexus owed to COSENTINO was $19,640.68. Lexus wrote COSENTINO a check for that amount.[9]

51. During the execution of the search warrant at COSENTINO's residence on February 5, 2024, agents found a Wells Fargo Bank Transaction receipt in the kitchen. The receipt was for a check that was deposited on November 29, 2024, into the SUBJECT ACCOUNT, in the amount of $19,640.68.

---

[9] Agents conducted an interview on December 3, 2024, in which an employee at Lexus of Albuquerque confirmed they issued COSENTINO a check for $19,640 from the two vehicles he traded in.



52.     Pursuant to a Grand Jury subpoena[10] that was issued for COSENTINO's bank accounts at Wells Fargo, FBI received bank records for the same time frame in which the check was deposited. On November 29, 2024, the SUBJECT ACCOUNT (Wells Fargo account 9804825850 under the name Joseph J Cosentino), reflected a deposit that was made in the amount of $19,640.68.

---

[10] The Grand Jury subpoena was issued on February 14, 2025, and served on February 18, 2025. Records responsive to the subpoena were received on March 7, 2025.

16

53. As of February 18, 2025, the remaining balance in the SUBJECT ACCOUNT was $17,800.54.

## VI. Other Efforts to Restrain or Enjoin the SUBJECT ACCOUNT

19. Based on my training and experience, I believe that efforts to restrain or enjoin the use of the SUBJECT ACCOUNT pursuant to 21 U.S.C. § 853(e) would be insufficient to maintain the property for forfeiture unless they amounted to maintaining the property in the custody of the United States without allowing any use or dissipation (which is essentially the effect of the requested Seizure Warrant). Cash is a liquid asset that is easy to dissipate and difficult to trace. Furthermore, the SUBJECT ACCOUNT constitutes evidence of violations of Title 21 United States Code 841 and should be maintained in the custody of United States to facilitate its evidentiary use, as well as its forfeiture.

## CONCLUSION

28. Based on the above facts and circumstances, there is probable cause to believe that the aforementioned SUBJECT ACCOUNT contains property constituting, or derived from, any proceeds that COSENTINO obtained, directly or indirectly, as the result of a violation of Title 21 United States Code § 841 and 846; and money, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in change for a controlled substance in violation of Title 21 United States Code § 841 and 846, and proceeds traceable to such an exchange. As such, the SUBJECT ACCOUNT is subject to seizure and forfeiture to the United States Government pursuant to Rule 41 of the Federal Rules of Criminal Procedure, Title 18 United States Code sections 981 and 982, and Title 21 United States Code sections 853(a) and 881(a)(6).

29. This affidavit was reviewed and approved by AUSAs Sean Sullivan and Lou Mattei.

30. I declare under penalty of perjury that the information contained in this affidavit is true and correct to the best of my knowledge.

Respectfully submitted,

_____
**Alexandra Rodriguez**
Special Agent
Federal Bureau of Investigation

Electronically signed and telephonically sworn
On this 15th day of May 2025:

_____
**Honorable John F. Robbenhaar**
United States Magistrate Judge